

**FILED**

**Nov 22, 2024**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

Michael A. Hirst (CA Bar No. 131034)
michael.hirst@hirstlawgroup.com
Marisela Bernal (CA Bar No. 329589)
marisela.bernal@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, California 95616
P - (530) 756-7700
F - (530) 756-7707

Timothy J. McInnis (NY Bar No. 2205086) (*pending admission pro hac vice*)
tmcinnis@McInnis-Law.com
McINNIS LAW
521 Fifth Avenue 17th Floor
New York, New York 10175-0038
P – (212) 292-4573
F – (718) 732-2304

Counsel for Plaintiff-Relator
David Reed

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* DAVID REED,<br><br>　　　　Plaintiff-Relator,<br><br>　v.<br><br>PHYSICIANS NETWORK MEDICAL GROUP, INC., d/b/a, ADVENTIST HEALTH MEDICAL GROUP and ADVENTIST HEALTH SYSTEM/WEST,<br><br>　　　　Defendants. | Civil Action No.:　2:24-cv-3255 DJC CSK<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |

## **INTRODUCTION**

1.　This is a *qui tam* action brought against defendants PHYSICIANS NETWORK MEDICAL GROUP, INC., d/b/a, ADVENTIST HEALTH MEDICAL GROUP ("PHYSICIANS") and ADVENTIST HEALTH SYSTEM/WEST ("ADVENTIST") (jointly, "Defendants"), under the False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA" or "Act"), to recover damages and civil penalties on behalf of the United States of America.

Complaint

2.    The allegations in this complaint arise from Defendants' unlawful receipt and retention of first-draw Paycheck Protection Program ("PPP") funds from the Small Business Administration ("SBA").

3.    Specifically, on or shortly before April 15, 2020, Defendants knowingly submitted, or caused others to submit, a PPP loan application and related information on behalf of PHYSICIANS for a loan in the amount of $10 million, of which the entire amount was pledged for payroll purposes.

4.    PHYSICIANS' PPP loan application falsely certified that PHYSICIANS was an eligible "small business" when in fact, as Defendants knew, PHYSICIANS did not satisfy the SBA's size criteria for small businesses, because of, among other things, its affiliation with ADVENTIST through common management, identity of interests, and totality of circumstances.

5.    Additionally, PHYSICIANS' PPP loan application falsely certified that PHYSICIANS satisfies SBA's economic need requirement for PPP loan eligibility (namely, that "current economic uncertainty made the loan request necessary to support the ongoing operations of" PHYSICIANS), when in fact, as Defendants well knew, PHYSICIANS did not satisfy the SBA's economic need standard because of its access to ADVENTIST's financial resources, as well as its own ability to generate revenue.

6.    On April 15, 2020, the SBA approved PHYSICIANS' PPP loan application.

7.    On or shortly after April 15, 2020, Defendants received $10 million in first-draw PPP funds, SBA loan number 1428837209 (the "PPP Loan").

8.    On or shortly before October 29, 2021, Defendants applied for or caused others to apply for forgiveness of the PPP Loan.

9.    On or about October 29, 2021, the SBA forgave the principal amount of Defendants' PPP Loan plus accrued interest, in the aggregate amount of $10,153,424.66.

10.    The conduct described above and alleged elsewhere in this Complaint violated 31 U.S.C. §§ 3729(a)(l)(A), (a)(l)(B), and (a)(l)(G).

11.    As a result of Defendants' PPP fraud, the United States of America ("United States") suffered economic losses, including but not limited to, the amount forgiven on the PPP Loan and bank processing fees, and is entitled to treble damages and maximum civil penalties, the precise amount of which will be determined at trial.

12.    For bringing this action, Relator is entitled to up to 30% of any recovery, plus reasonable attorneys' fees, costs, and expenses.

## PARTIES, ENTITIES, AND PERSONS

### Relator Reed

13.    Relator Reed resides in Cary, Wake County, North Carolina.

### The United States

14.    The United States, acting through the SBA and supported by the U.S. Department of Treasury, is the real party-plaintiff-in-interest in the *qui tam* claim in this action.

15.    The SBA's headquarters are located at 409 Third Street, SW, Washington, D.C. 20416.

16.    The SBA was created in 1953 as an independent agency of the United States government to aid, counsel, assist, and protect the interests of small business concerns, to preserve free competitive enterprise, and to maintain and strengthen the overall U.S. economy.

17.    Among other mandates, the SBA assists small businesses in recovering from economic disasters, such as the coronavirus pandemic that adversely affected the U.S. economy beginning in early 2020.

18.    One of the instruments available to the SBA in such circumstances is the provision of forgivable low-interest loans to qualified borrowers under various so-called "SBA 7a Loan Programs," including the PPP.

### Defendants PHYSICIANS and ADVENTIST PHYSICIANS

19.    Defendant PHYSICIANS is an active California domestic for profit professional corporation that was formed on June 27, 2011. Registration Number: 3389013.

20.     PHYSICIANS does business under the name Adventist Health Medical Group and calls itself a "multispecialty group of 450 medical professionals including physicians, dentists, nurse practitioners and physician assistants." https://www.adventisthealthmedicalgroup.com.

21.     PHYSICIANS' National Provider Identification number ("NPI") is 1932477874.

22.     PHYSICIANS is located at 1 Adventist Health Way, Roseville, CA, 95661 and its main telephone number is (916) 789-4209.

## ADVENTIST

23.     Defendant ADVENTIST is an active California domestic religious nonprofit corporation that was formed on April 17, 1980. Registration Number: 980746.

24.     ADVENTIST describes itself as "a faith-based, nonprofit, integrated health system serving more than 100 communities on the West Coast and Hawaii with over 440 sites of care, including 28 acute care facilities. Founded on Adventist heritage and values, Adventist Health provides care in hospitals, clinics, home care, and hospice agencies in both rural and urban communities. Our compassionate and talented team of more than 38,000 includes employees, physicians, Medical Staff and volunteers driven in pursuit of one mission: living God's love by inspiring health, wholeness, and hope." https://www.adventisthealth.org/about-us.

25.     As of December 31, 2023, ADVENTIST reported $ 6.0 billion in total revenue and $182 million in earnings before interest, depreciation, and amortization ("EBIDA"). It also reported having $2.3 billion in cash and investments, with 132 days of cash on hand, and a 46.8% debt to capital. Adventist also had a $2 billion 10-year capital spend and has 220,000 at-risk lives. https://www.adventisthealth.org/about-us/investor-relations.

26.     ADVESTIST reported employing 4,715 people, earning $658,435,900 in total revenue and having more than $3 billion in assets during 2020. IRS Form 990.

27.     ADVENTIST is located at 1 Adventist Health Way, Roseville, CA, 95661 and its main telephone number is (916) 406-0000.

28.     The NPI Number for Adventist Health System/West is 1265908032. It is registered with the United States Department of Health and Human Services as a "Religious Nonmedical

Health Care Institution," meaning it: (a) furnishes only nonmedical nursing items and services to patients who choose to rely solely upon a religious method of healing, and for whom the acceptance of medical services would be inconsistent with their religious beliefs; (b) furnishes nonmedical items and services exclusively through nonmedical nursing personnel who are experienced in caring for the physical needs of nonmedical patients. (For example, caring for physical needs such as assistance with activities of daily living; assistance in moving, positioning, and ambulation; nutritional needs; and comfort and support measures); (c) furnishes nonmedical items and services to inpatients on a 24-hour basis; and (d) does not furnish, on the basis of religious beliefs, through its personnel or otherwise, medical items and services (including any medical screening, examination, diagnosis, prognosis, treatment, or the administration of drugs) for its patients.

29.    In light of ADVENTIST's status as a "non-medical health care institution," particularly the fact that ADVENTIST itself does not provide medical services or items for its patients, much of the revenue ADVENTIST receives is through payments from PHYSICIANS, which is a conventional medical group practice that provides (and bills for) typical medical services and items.

30.    ADVENTIST is separately owned and operated from the Seventh-Day Adventist Church.

## PHYSICIANS- ADVENTIST AFFILITION

31.    PHYSICIANS states it is "In partnership with Adventist Health hospitals" and that it "contracts with Adventist Health hospitals and healthcare entities to provide professional medical services in a variety of healthcare environments including hospitals, cancer centers, urgent care and primary and specialty care clinics. Adventist Health Medical Group provides care in 220 Adventist Health clinics across California, in metropolitan areas such as Los Angeles and rural communities like Hanford."

32.    On its main webpage PHYSICIANS is branded in the same manner as ADVENTIST, with each using the same entity name, "AdventistHealth," logo, and colors.

33.     If patients seek a provider with a particular specialty on the ADVENTIST website, they are directed to individuals who are identified as "affiliated providers." See, e.g., https://doctors.adventisthealth.org/provider/benjamin-k-hendricks/3050624?specialties=Neurosurgery&sort=relevance%2Cnetworks%2Cavailability_density_best&from=search-list.

34.     PHYSICIANS identified the following persons  as its principal officers: Arby Nahapetian, M.D. ("Nahapetian") (CEO); Adrian Sema ("Sema") (CFO); and Steven Harber ("Habor") (Secretary). See California Secretary of State filing.

35.     Nahapetian also serves on the Leadership Team of Adventist as Chief Clinical Officer. In his role with Adventist as Chief Clinical Officer, Nahapetian serves as Adventist's clinical care delivery leader overseeing the medical group, medical affairs, population health, quality, safety, care management, clinical informatics, and pharmacy. https://www.adventisthealth.org/about-us/leadership-team.

36.     Adventist reported that Nahapetian worked on average 50 hours per week for Adventist as Care Division Chief Medical Officer and Adventist paid him $868,206 in reportable compensation in 2020. He also received $54,711 in other compensation that year. IRS Form 990.

37.     Sema is President of Adventist Health Physician Services, which is part of ADVENTIST, and "represents all of the clinics across the company." https://www.adventisthealthstory.org/story/adrian-serna.

38.     Harber is the President of St Helena Hospital which is part of Adventist. https://www.adventisthealth.org/st-helena/about-us/executive-team.

39.     There are at least three PHYSICIANS Directors who are, or were, members of ADVENTIST'S management team, including, James Burke (former System Chief Medical Officer, former Ambulatory Medical Officer, former Sr. Medical Director- Ambulatory and System Medical Director- Emergency Medicine, former Regional Medical Director, and former Medical Director Montrose Urgent Care); Raul Ayala (current Ambulatory Medical & DIO Officer, former Market Medical Officer); and Ed Kim (current Chief Administrative Officer,

1  former Chief Operations Officer). See https://rocketreach.co/james-burke-email_59081360;

2  https://www.zoominfo.com/p/Raul-Ayala/1984206875; and https://rocketreach.co/edward-kim-

3  email_4937351, respectively.

4      40.    The addresses provided for PHYSICIANS' Officers and Directors is One Adventist

5  Health Way in Roseville CA, which is also the address of Adventist.

6      41.    Online job applicants for positions at PHYSICIANS are routed to ADVENTIST'S

7  online job portal site. Similarly, job descriptions for positions at PHYSICIANS (e.g.,

8  Rheumatologist) are hyperlinked to ADVENTIST's website.

9                          **Non-Party PPP Lender Bank**

10      42.    The SBA contracted with numerous banks and other financial institutions to serve

11  as PPP loan processors, underwriters, and lenders during 2020 and 2021. These lenders received

12  fees from the SBA for processing PPP loan applications and forgiveness requests.

13      43.    Live Oak Bank, a subsidiary of Live Oak Bancshares, Inc., with its headquarters

14  located in Wilmington, NC, contracted with the SBA to process, underwrite, and make PPP loans.

15      44.    Defendants submitted, or caused others to submit, its application and loan-

16  forgiveness related information for the PPP Loan to Live Oak Bank.

17      45.    Live Oak Bank received $100,000 for processing the PPP Loan.

18                          **JURISDICTION AND VENUE**

19      46.    This Court has original subject matter jurisdiction over the FCA *qui tam* claims

20  alleged in this Complaint under 28 U.S.C. § 1331 (federal question) and 31 U.S.C. § 3732(a) (False

21  Claims Act).

22      47.    This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a)

23  because Defendants can be found, reside, or transact business in this District. Section 3732(a) of

24  the FCA further provides for service of process at any place within or outside the United States.

25      48.    Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391

26  because Defendants can be found, reside, and transact business in this District; acts proscribed by

27

28

31 U.S.C. § 3729 occurred within this District; and a substantial part of the events or omissions giving rise to the *qui tam* claims alleged in this Complaint occurred in this District.

**FCA SUBJECT MATTER JURISDICTION**

49.    Relator brings this *qui tam* action pursuant to 31 U.S.C. § 3730(b).

**LIABILITY, DAMAGES, AND AWARDS UNDER THE FCA**

50.    The FCA imposes civil liability on "any person" who, among other things:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. §§ 3729(a)(l )(A), (B), and (G).

51.    Section 3729(b)(l) of the Act defines the terms "knowing" and "knowingly" to mean that a person, with respect to information, has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information; and requires no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(l).

52.    Section 3729(b)(2) of the Act defines "claim" to mean any request or demand, whether under a contract or otherwise, for money or property, whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States, or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded, or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2)(A) (as amended May 20, 2009; the prior version is materially identical for purposes of this action).

53.     Section 3729(b)(3) of the Act defines the term "obligation" to mean an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

54.     Section 3729(b)(4) of the Act defines the term "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

55.     Section 3729(a) of the Act provides that any person who knowingly violates the FCA is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461, P.L. 104-410), which currently sets the minimum penalty at $13,508 and the maximum penalty at $27,018, plus three times the amount of damages the Government sustains because of the fraudulent conduct.

56.     Section 3730(d) of the Act provides that when the Government intervenes in and proceeds with an action commenced by the filing of a *qui tam* complaint pursuant to 31 U.S.C. § 3730(b) and recovers money or property from a defendant under Section 3729, the person who initiated the action (known as the "relator"), shall receive between fifteen percent (15%) and twenty-five percent (25%) of the proceeds, subject to certain exceptions and limitations, none of which apply here.

57.     Where the Government does not intervene in the *qui tam* action, and the relator pursues the action without the Government's involvement and recovers proceeds from a defendant under Section 3729, the relator, again subject to certain exceptions and limitations that do not apply here, shall receive between twenty-five percent (25%) and thirty percent (30 %) of the proceeds. 31 U.S.C. § 3730(b).

58.     Whether the Government intervenes in the matter or not, the relator in a successful *qui tam* action is also entitled to an award against the defendant for the amount of reasonable expenses, attorneys' fees, and costs incurred in pursuing the *qui tam* claims. *Id.*

## FCA'S STATUTE OF LIMITATIONS

59.     A *qui tam* claim under section 3730(b) of the FCA may not be brought (1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last. 31 U.S.C. § 3731(b).

## PPP LAWS, REGULATIONS, RULES, AND FORMS

60.     Congress authorized the Paycheck Protection Program in the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, P.L. 116-136, in or about March 2020.

61.     The program was intended to provide emergency financial assistance to the millions of Americans who were suffering the economic effects of the COVID-19 pandemic through forgivable loans to small businesses to support job retention and cover other specified expenses.

62.     The two most favorable aspects of the loans were a low interest rate (namely, 1%) and the opportunity to have the loan's principal and accrued interest completely forgiven if certain specified conditions were met.

63.     Congress made PPP loans available in two separate rounds or "draws."

64.     The first-draw application period began in or about March 2020 and ended in or about May 2020.

65.     The application period for the second draw, which was for certain eligible first-draw borrowers, began in or about January 2021 and ended in or about March 2021.

66.     In total, PPP borrowers received approximately $815 billion in low-interest, potentially forgivable loans.

### First Draw PPP Loans

67.     Congress originally authorized approximately $349 billion in PPP funds in March 2020 under the SBA's Section 7(a) Loan Program. In April 2020, Congress authorized an additional estimated $300 billion in PPP funds.

68.    Between approximately April 3, 2020, and August 8, 2020, the SBA made roughly 5.2 million PPP loans.

69.    Approximately 660,000 applicants received between $150,000 and $10 million in PPP funds.

70.    The SBA's Office of Inspector General ("010") has since publicly acknowledged there was massive fraud in the applications for, and receipt of, PPP funds.

**SBA Form 2483**

71.    To obtain PPP funding, the eligible and qualified borrower had to prepare and submit to a participating lender an SBA PPP loan application form ("Form 2483"), signed by the borrower or an agent or representative, as well as certain supporting documentation and information.

72.    Form 2483 was revised a number of times, but the original version, and the one at issue in this Complaint, was dated April 2020.

73.    Form 2483 required the borrower to specify, among other details, its "Average Monthly Payroll" and "Number of Employees."

74.    Under PPP rules, the Average Monthly Payroll and Number of Employees figures were used to calculate the maximum amount of funds the borrower was eligible to receive.

75.    That maximum sum was calculated as the borrower's Average Monthly Payroll during a prescribed period multiplied by 2.5, with certain adjustments if the borrower had received an SBA Economic Injury Disaster Loan.

76.    The average monthly payroll cost was derived by aggregating allowable payroll costs from the prior twelve months (with certain exceptions) for employees whose principal place of residence was the United States and subtracting compensation paid to any employee in excess of an annual salary of $100,000. That figure was then divided by twelve to arrive at the average monthly payroll cost. Regardless of the borrower's actual calculated average monthly payroll, the maximum PPP for any single borrower loan could not exceed $10 million.

77.    Form 2483 further required applicants to specify the purpose of the loan; allowable purposes included "Payroll," "Lease/Mortgage Interest," "Utilities," and "Other," the last of which required the applicant to explain.

78.    Form 2483 also required the borrower to affirm, among other things, having read and understood Form 2483 and the rules governing the borrower's eligibility to receive a PPP loan under the SBA rules in effect at the time the application was submitted.

79.    Form 2483 required the borrower to certify that:

The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the [various PPP and CARE Acts and program rules].

The Applicant ... employs no more than the greater of 500 employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. § 121.201 for the Applicant's industry or under the SBA alternative size standard. [Note: The size standard first appeared in the January 8, 2021, version of Form 2483.]

80.    Form 2483 required the borrower to certify that:

All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule.

81.    Form 2483 required the borrower to certify (by initialing) that:

Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

82.    Form 2483 required the borrower to certify that:

The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule. I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

83.    Form 2483 required the borrower to certify that:
I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.

84.    Form 2483 required the borrower to certify that:

During the period beginning on February 15, 2020, and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program.

85.    Form 2483 required the borrower to certify as follows:

I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC §§ 1 001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC § 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC § 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

### PPP Loan Application Processing

86.    First-draw PPP loans were processed by SBA-authorized participating lenders.

87.    To obtain the requested loan amount, prospective borrowers were required to provide the lenders, in addition to the Form 2483, supporting documentation. Such documentation included IRS or state revenue department forms showing periodic employment and unemployment tax information for the borrower, for instance IRS Forms 940 (Employer's Annual Federal Unemployment Tax Return), 941 (Employer's Quarterly Federal Tax Return), W-2 (Wage and Tax Statement), and W-3 (Transmittal of Wage and Tax Statements) for the employees the borrower was claiming.

88.    When the PPP loan application was approved, the participating lender funded the PPP loan using its own monies. The SBA guaranteed 100% of the loan.

89.    At or about the time PPP loans were approved, the lenders conveyed borrowers' loan application information to the SBA.

### PPP Loan Forgiveness

90.    For a PPP loan to be forgivable, the PPP rules as finally implemented required that the PPP funds be expended for authorized purposes during the 24-week period following receipt of the loan proceeds and that at least 60% of the potential forgiveness amount be used for covered payroll expenses.

91.    Approved borrowers seeking forgiveness were required by the terms of Form 2483 to provide documentation verifying the number of full-time-equivalent employees on the borrower's payroll, as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the 24-week period following receipt of the loan proceeds.

**SBA Form 3508**

92.    To obtain PPP loan forgiveness, borrowers had to submit an SBA Form 3508 ("Form 3508") to the lender in compliance with the instructions set out in SBA Form 3508EZ.

93.    Form 3508 required the borrower to certify that:

> The dollar amount for which forgiveness is requested: was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments); ...

> I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.

> The information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects. I understand that knowingly making a false statement to obtain forgiveness of an SBA-guaranteed loan is punishable under the law, including 18 U.S.C. §§ 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. § 645 by imprisonment of not more than two years and/or a fine of not more than … [and] … $5,000; and, if submitted to a Federally insured institution, under 18 U.S.C. § 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

**PPP FAQs RESOURCES**

94.    In addition to promulgating and publishing PPP rules and regulations, the SBA also disseminated to the general public, including via the Internet, Paycheck Protection Program Loans Frequently Asked Questions (FAQs), which provided summaries and explanations of the program's requirements for both round one and round two loans.

**SBA's SMALL BUSINESS CRITERIA**

95.    To be eligible for certain SBA programs and contracts, including the PPP, a firm had to be a "small business concern" under SBA's size regulations, which are set forth at 13 CFR part 121.

96.    A borrower could satisfy the SBA's size criteria for first-draw PPP loans in any of three ways, namely, the concern: (a) employed fewer than 500 people; (b) met the SBA's industry-specific size requirements; or (c) met the SBA's "alternative size standard."

**500 Employees Determination**

97.    The PPP first-draw application form expressly states that an applicant is eligible for a PPP loan if the company employees fewer than 500 employees. See SBA Form 2483 (04/20), certifications and authorizations page.

98.    Under SBA regulations, to determine a concern's number of employees, the loan applicant must count all individuals employed on a full-time, part-time, or other basis. This count includes employees obtained from a temporary employee agency, professional employee organization, or employee leasing concern.

99.    Additionally, the SBA's size regulations require that the number of employees be based upon the average number of employees (including employees of the concern's domestic and foreign affiliates) for each pay period for the preceding 24 calendar months. 13 CFR § 121.106.

**NAICS Industry Size Determination**

100.    The PPP first-draw application form expressly states that, in the alternative, an organization can be eligible for a PPP loan if it "meets the [greater] size standard in number of employees established by the SBA in 13 C.F.R. § 121.201 for the Applicant's industry." See SBA Form 2483 (04/20), certifications and authorizations page.

101.    The size standards vary by NAICS Industry designation and are measured by Size Standards in Millions of Dollars and/or Size Standards in Number of Employees.

102.    The applicable NAICS Industry designation for the PPP Loan at issue here is 621111 (Offices of Physicians, except Mental Health Specialists).

103.    For NAICS code 621111, the Size Standard in Millions of Dollars in April 2020 was $12 million; it is now $16 million. https://www.law.cornell.edu/cfr/text/13/121.201.

104.    To determine a concern's annual receipts, SBA regulations require that all revenue, in whatever form received or accrued and from whatever source, be counted including revenue from the sales of products or services, interest, dividends, rents, royalties, fees, or commissions, reduced by returns and allowances. The regulations further provide that the "annual receipts of a concern that has been in business for 5 or more completed fiscal years means the total receipts of the concern over its most recently completed 5 fiscal years divided by 5." 13 CFR § 121.l 04.

105.    There is no listed Size Standard in Number of Employees for this NAICS code 62111. *Id*. Accordingly, Form 2483's 500-employee standard governs where the number-of-employees test is used.

**SBA Alternative Size Standard.**

106.    Later versions of the PPP application form (see revision 1/8/2021), as well as later FAQs (see FAQs as of January 29, 2021, Question/Answer #2) provide a third means by which an applicant may be deemed a "small business" for PPP purposes. This is known as the SBA's "Alternative Size Standard." 15 U.S. Code § 632(a)(5).

107.    Under the SBA's Alternative Size Standard, a business could qualify for the PPP as a small business concern if it met both of the following tests as of March 27, 2020: (1) the maximum tangible net worth of the business was not more than $15 million, and (2) the average net income of the organization after federal income taxes (excluding any carry-over losses) for the two full fiscal years before the date of the application was not more than $5 million. *Id*.

**SBA AFFILIATION RULES, REGULATIONS**

108.    In determining whether a concern is deemed an eligible "small business" by the SBA the number of employees and financial resources of an applicant is considered together with those of its affiliates. 15 U.S.C. 636(a).

109.    The SBA's affiliation rules are set forth in 13 CFR 121.103 and 13 CFR 121.301.[1]

110.    Like other SBA program participants, PPP borrowers were required to apply and abide by SBA's normal affiliation rules and regulations.

111.    The SBA made this clear in its early publicly disseminated FAQS for the PPP. Specifically, Question 5 in the SBA's April 6, 2020, PPP FAQs asks: "Are borrowers required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)?"

112.    The SBA's Answer was: "Yes. Borrowers must apply the affiliation rules, including any applicable exceptions or affiliation waivers, set forth in SBA's Interim Final Rule on Affiliation, Interim Final Rule on Treatment of Entities with Foreign Affiliates, the consolidated interim final rule implementing updates to the PPP, and the interim final rule for Second Draw PPP Loans. A borrower must certify on the applicable Borrower Application Form that the borrower is eligible to receive a PPP loan. For a First Draw PPP Loan, that certification means that the borrower has no more than 500 employees, is a small business concern as defined in section 3 of the Small Business Act (15 U.S.C. 632) that meets the applicable SBA employee-based or revenue-based size standard, or meets the tests in SBA's alternative size standard, after applying the affiliation rules, if applicable."

113.    In order to help potential borrowers identify other businesses with which they may be deemed to be affiliated, Form 2483 required applicants to list other businesses with which they had common management. The information supplied by the applicant in response to that information request was to be used by applicants to assess whether they had affiliates that should be included when certifying whether the applicant was a "small business" under SBA rules and regulations.

---

[1] There is a religious exemption to the SBA's affiliation rules for faith-based organizations where the relationship is based on a religious teaching or belief or otherwise constitutes a part of the exercise of religion. 13 CFR 121.103(b)(10). This exemption does not apply here because the affiliation relationship is based on the secular provision of health care services. There are also certain SBA waivers for the affiliation rules for PPP loan purposes, but none of these is applicable here, either.

114.    In most cases, a PPP applicant's number of employees and financial resources were considered together with its affiliates based on the following four factors: majority stock ownership, other securities and agreements affecting corporate control, overlapping management, and identity of interest. 13 CFR 121.301. See also https://www.sba.gov/sites/default/files/2020-06/Affiliation%20rules%20overview%20%28for%20public%29%20v2-508.pdf.    (Affiliation Rules for Paycheck Protection Program, dated April 3, 2020.) These four factors are discussed in greater detail below:

    a.    **Affiliation based on ownership**. For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity.

    b.    **Affiliation arising under stock options, convertible securities, and agreements to merge.** In determining size, SBA considers, among other financial instruments, stock options, convertible securities, and agreements to merge (including agreements in principle) to have a present effect on the power to control a concern. SBA treats such options, convertible securities, and agreements as though the rights granted have been exercised.

    c.    **Affiliation based on management**. Affiliation arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns. Affiliation also arises where a single individual, concern, or entity that controls the Board of Directors or management of one concern also controls the Board of Directors or management of one of more other concerns. Affiliation also arises where a single individual, concern or entity controls the management of the applicant concern through a management agreement. See 13 C.F.R. § 121.103(e).

    d.    **Affiliation based on identity of interest**. Finally, affiliation arises when there is an identity of interest between close relatives, as defined in 13 CFR 120.10, with identical or substantially, identical business or economic interests (such as where the close relatives operate concerns in the same or similar industry in the same geographic area). Where SBA determines that

interests should be aggregated, an individual or firm may rebut that determination with evidence showing that the interests deemed to be one are in fact separate. See 13 CFR 121.301(f).

### SBA SIZE AND AFFILIATION RULE GUIDANCE

115.    The SBA published guidance for determining size and affiliation in July 2020. See Small Business Compliance Guide: A Guide To The SBA's Size Program And Affiliation Rules ("SBA Guidance").

116.    The SBA Guidance makes clear that the applicant must consider not only the number of employees from any affiliate when making the small business concern assessment but also the annual receipt of revenues from all affiliated entities. *Id*. at 27.

117.    As a general principle, affiliation exists when one business controls or has the power to control another or when a third party controls or has the power to control both businesses. Control may arise through ownership, management, or other relationships or interactions between the parties.

118.    Control may be affirmative or negative. Negative control includes circumstances where a minority shareholder has the ability, under the concern's charter, bylaws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders.

119.    The SBA Guidance concerning affiliation by common management and identity of interest are particularly relevant here. They are discussed in more detail below.

### Affiliation By Common Management

120.    If one or more officers, directors, managing members, or general partners of a business concern also control the Board of Directors and/or the management of another business concern, the concerns are affiliates. *Id*. at 13.

121.    The test of common management does not require that the person(s) exercising the common management have total control of a concern. Critical influence or the ability to exercise substantive control over the concern's operations is also a basis for finding affiliation between entities. Persons in senior leadership positions, such as the CEO and COO, are presumed to

exercise substantive control over a firm's operations/ although they can rebut that presumption by showing significant evidence to the contrary. *Id*.

122. For PPP purposes, affiliation also arises where a single individual, concern, or entity controls the management of the applicant concern through a management agreement. *Id*.

### Affiliation by Identity of Interest and/or Economic Dependence

123. Individuals or firms that have identical (or substantially identical) business or economic interests may be treated as one party (i.e., affiliated) unless they can demonstrate otherwise.

124. Family members, persons with common investments, or firms that are economically dependent on each other through contractual (or other) relationships, are presumed to be affiliated. *Id* at 13.

125. However, individuals or firms may seek to demonstrate that no affiliation exists by showing that apparently identical interests are, in fact, separate. *Id*.

126. Patterns of subcontracting, commingling of staff and/or facilities, and other substantial ties may demonstrate an identity of interest. *Id*. At 13-14.

127. The SBA Guidance describes different types of identity of interest for affiliation purposes, including the following two examples:

> Example 1: Several officers of Company A are also officers of Company B. The two companies are in the same line of work and extensively subcontract with each other. The interrelationship between the two companies results in them acting as one, and therefore they have an identity of interest and are considered affiliates.

> Example 2: Companies A and B share office space and equipment in the same location and also share key employees. In addition, Company A has sent a substantial amount of business to Company B for each of the last three years (which amounts to more than 70% of Company B's total revenues). All these facts, taken together, indicate that the two companies have combined their resources to each other's benefit and therefore are affiliated.

*Id.* at 14.

128. The SBA Guidance also includes 'totality of circumstances" test for affiliation pursuant to 13 C.F.R. 121.103(a)(5). It provides: "Affiliation may be found under the totality of the circumstances, even if the evidence is insufficient to show affiliation for a single independent factor

listed above. In order to make such a finding, affiliation may be found when the ties between the businesses are so suggestive of reliance as to render the businesses affiliates." *Id*. at 22.

**AFFILIATION RULE AND ECONOMIC NEED CERTIFICATION**

129.    As alleged above, Form 2483 required the borrower to certify that: "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

130.    The SBA made clear in its April 23, 2020 PPP published FAQs, that in making this determination, the borrower needed to consider not only its own resources but also those of any affiliate as well.

131.    Specifically, Question 31 asked: "Do businesses owned by large companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan?" (Question 31 published April 23, 2020 and revised March 3, 2021 to reflect subsequent PPP guidance and the interim final rule implementing updates to the PPP and the interim final rule for Second Draw PPP Loans.).

132.    The SBA's Answer was: "In addition to reviewing applicable affiliation rules to determine eligibility, all borrowers must assess their economic need for a PPP loan under the standard established by the CARES Act and the PPP regulations at the time of the loan application. Although the CARES Act suspends the ordinary requirement that borrowers must be unable to obtain credit elsewhere (as defined in section 3(h) of the Small Business Act), borrowers still must certify in good faith that their PPP loan request is necessary. Specifically, before submitting a PPP application, all borrowers should review carefully the required certification that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." *Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business*." (Emphasis added.)

## PHYSICIANS' AFFILIATION WITH ADVENTIST

### Affiliation Based on Common Management

133.    As CEO of PHYSICIANS, Nahapetian had the highest level of managerial control over that entity. And as Chief Clinical Officer/Chief Medical Officer on the Leadership Team at ADVENTIST, Nahapetian oversaw the entire medical group, medical affairs, population health, quality, safety, care management, clinical informatics, and pharmacy, and thereby had the ability to exercise substantive managerial control over ADVENTIST's operations.

134.    Nahapetian also worked 50 average hours per week for ADVENTIST and was one of ADVENTIST's highest-paid employees, earning more than $900,000 annually.

135.    Likewise, PHYSICIANS' CFO Sema and its Secretary Harber occupied high-level managerial positions at both organizations, as President of Adventist Health Physician Services and President of St Helena Hospital, respectively.

136.    Additionally, at least three members of PHYSICIANS' Board of Directors were also employed in significant managerial positions at ADVENTIST. Specifically, James Burke was the System Chief Medical Officer, Ambulatory Medical Officer, Sr. Medical Director- Ambulatory and System Medical Director- Emergency Medicine, Regional Medical Director, and Medical Director Montrose Urgent Care for ADVENTIST. Raul Ayala is the Ambulatory Medical & DIO Officer for ADVENTIST and was its Market Medical Officer. And Ed Kim is ADVENTIST's current Chief Administrative Officer and was its Chief Operations Officer.

137.    Based on the above, there is affiliation by management between PHYSICIANS and ADVENTIST.

### Affiliation Based on Identity of Interest and/or Economic Dependence

138.    PHYSICIANS and ADVENTIST share an identity of interest.

139.    The two organizations work in the same field (namely, healthcare) and extensively contract with each other.

140.    Several of PHYSICIANS' executive officers and directors are also employed by ADVENTIST in key positions.

141.     PHYSICIANS and ADVENTIST share substantial resources such as equipment and facilities in the same locations, namely, ADVENTIST's hospitals and clinical facilities.

142.     PHYSICIANS contracts with ADVENTIST to provide professional medical services in a variety of healthcare environments including hospitals, cancer centers, urgent care and primary and specialty care clinics. The equipment and facilities in those places belong to ADVENTIST but are also used by PHYSICIANS.

143.     Online internet searchers can only access the services of PHYSICIANS via a single source contract with ADVENTIST, which makes PHYSICIANS totally dependent on ADVENTIST economically.

144.     ADVENTIST's status as a "non-medical health care institution," meaning it does not provide medical services or items for its patients, implies that much of the revenue ADVENTIST receives is through its contractual partnership with PHYSICIANS, which is a conventional medical group practice that provides (and bills for) typical medical services and items.

145.     PHYSICIANS and ADVENTIST share administrative functions, such as Human Resources, as well as websites and IT systems.

**Affiliation Based on Totality of Circumstances**

146.     In addition to the foregoing, the ties between PHYSICIANS and ADVENTIST are so suggestive of reliance on each other that they are rendered to be businesses affiliates.

147.     The addresses provided for of PHYSICIANS' Officers and Directors is One Adventist Health Way in Roseville CA, which is also the address for ADVENTIST.

148.     Online job applicants for position at PHYSICIANS are routed to ADVENTIST'S online job portal site. Similarly, job descriptions for positions at PHYSICIANS (e.g., Rheumatologist) are hyperlinked to ADVENTIST's website.

149.     On its main webpage PHYSICIANS is branded in the same manner as ADVENTIST, with each using the same entity name, "AdventistHealth," logo and colors.

150.    If a prospective patient seeks a doctor or other healthcare provider with a particular specialty on the ADVENTIST website, they are directed to employees of PHYSICIANS, and these providers are referred to by ADVENTIST as "affiliated providers." See, e.g., https://doctors.adventisthealth.org/provider/benjamin-k-hendricks/3050624?specialties=Neurosurgery&sort=relevance%2Cnetworks%2Cavailability_density_best&from=search-list.

**PHYSICIANS FAILS THE SBA SIZE TESTS**

151.    PHYSICIANS did not meet any of the three size standards set forth above for being deemed a "small business" under SBA rules and regulations.

152.    Given the allegations in this Complaint concerning PHYSICIANS's own size (namely, 485 employees) and its affiliation with ADVENTIST, which employs more than 4,700 people, it is reasonable to conclude that at the time of its PPP application PHYSICIANS had: (a) more than 500 employees; (b) annual receipts greater than $12 million; and (c) a tangible net worth well over $15 million as of March 27, 2020, or an average net income of more than $5 million for the two fiscal years prior to the date of the PPP Loan application, that is for 2018 and 2019.

**MATERIALITY ALLEGATIONS**

153.    Upon information and belief, prior to receiving notice of Relator's allegations, the United States was unaware of the false and fraudulent Form 2483 Defendants submitted, or caused others to submit, to Live Oak Bank and the SBA.

154.    Upon information and belief, a PPP borrower's size was material to the SBA's decisions to make PPP funds available to borrowers and to forgive PPP loans, generally.

155.    Not truthfully and accurately disclosing the organization's size in a first-draw PPP loan was material to the SBA's PPP loan and forgiveness decision-making process, specifically. This can be inferred from three Department of Justice press releases announcing the settlement of FCA cases alleging PPP fraud based on the applicant's failure to meet the SBA's criteria for "small business." See Empire Roofing, Inc., December 11, 2023; Victory Automotive Group Inc., October 11, 2023; and Fujisoft America, Inc., June 9, 2023.

156.    A case directly on point is *US ex rel. Zacha1y Holtzman v. Dr. David P. May; Shore Memorial Hospital d/b/a Shore Medical Center*, 23-cv-3680 (JHR) (D.N.J.). There, Shore Memorial Hospital paid the United States $3,151,077.17 to settle False Claims Act allegations that its affiliated physician practice, Shore Memorial Physicians' Group, P.C., improperly obtained a PPP loan and forgiveness because, when combined with the hospital under the SBAs affiliation rules, the physician group was too big to be eligible for a PPP loan.

## **SPECIFIC FACTUAL ALLEGATIONS CONCERNING PPP FRAUD**

157.    On or before April 15, 2020, Defendants submitted, or caused others to submit, a Form 2483 to Live Oak Bank for a $10 million PPP loan.

158.    On its PPP loan application, PHYSCIANS represented it was seeking funds to protect 485 jobs, its NAICS code number was 6211, and that 100% of the requested funds would be used for payroll purposes.

159.    Defendants' Form 2483 certified that PHYSICIANS was eligible for a PPP loan under applicable SBA and PPP laws, regulations, and rules, generally, and was a small business concern according to SBA size and affiliation standards and that PHYSICIANS satisfied the SBA's economic uncertainty need requirement.

160.    In fact, at the time of its PPP loan application submission, PHYSICIANS was not a small business concern and did not satisfy the SBA's economic uncertainty need requirement.

161.    Defendants knew it was not a small business concern and did not satisfy the SBA's economic uncertainty need requirement at the time it submitted the Form 2483 to Live Oak Bank.

162.    On or about April 15, 2020, Defendants' PPP loan application was approved.

163.    Shortly after April 15, 2020, Defendants received $10 million in PPP loan funds.

164.    Prior to October 29, 2021, Defendants submitted, or caused others to submit, a Form 3508 to Live Oak Bank seeking complete forgiveness of its PPP loan.

165.    On or about October 29, 2021, the SBA forgave the principal and accrued interest on the PPP Loan, in the aggregate amount of $10,153,424.66.

166.    The SBA's PPP rules and regulations in effect at the time Defendants' loan was forgiven on October 29, 2021, precluded non-small business concerns and borrowers who received more than $2 million they did not need from lawfully receiving and retaining first-draw PPP loan proceeds.

**FACTUAL ALLEGATIONS CONCERNING SCIENTER**

167.    The SBA's PPP laws, rules, regulations, forms and guidance relevant to this action, including SBA Form 2483, are clear and unambiguous.

168.    SBA published clear and authoritative guidance on how to lawfully apply for PPP loans and forgiveness, including FAQs on the SBA's website that answered questions concerning eligibility for first-draw PPP loans based on size, economic need, and affiliation. See, e.g., https://www.sba.gov/document/support-affiliation-rules-paycheck-protection-program.

169.    Non-SBA websites covering the PPP advised potential borrowers that they were not eligible for first-draw PPP loans if they were too big to be considered a small business concern by the SBA. See, e.g., https://www.gibsondunn.com/analysis-of-small-business-administration-memorandum-on-affiliation-rules-and-faqs-on-paycheck-protection-program/.

170.    Similarly, non-SBA websites alerted borrowers that they needed to return PPP funds if they determined that they could not meet the "economic uncertainty"/"necessity" certification in good faith — especially for those borrowers receiving $2 million or more in PPP funds. See, e.g., https://govcon.mofo.com/topics/is-my-companys-ppp-loan-necessary-to-support-ongoing-operations-what-if-im-wrongs.

171.    The Supreme Court decision in *United States ex rel. Schutte V. Supervalu Inc*. has left open the question of whether an objective form of "recklessness" can satisfy the FCA's scienter requirement. 598 U.S. 739, 751 n.5 (2023).

172.    All participants in government programs generally are obligated to familiarize themselves with the program's legal requirements, standards, and procedures.

173.    Since the SBA and others published many notices on various websites alerting PPP borrowers about complying with the agency's size and affiliation rule, it was grossly reckless for

a borrower, such as PHYSICIANS, seeking the largest possible PPP loan ($10 million) to avoid learning of these requirements.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of 31 U.S.C. § 3729(a)(l)(A) (False or Fraudulent Claims)

174.    Relator realleges and incorporates all allegations in this Complaint as though fully set forth herein.

175.    The FCA imposes liability on any person who, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l)(A).

176.    Through the acts described above and otherwise, Defendants, by and through its employees, agents, and representatives, knowingly, or acting with deliberate ignorance or reckless disregard for the truth, presented or caused to be presented to an SBA-authorized PPP lender and to an officer or employee of the SBA a false or fraudulent Form 2483 and related loan materials and information, in violation of 31 U.S.C. § 3729(a)(l )(A).

177.    As a result of this conduct, the United States suffered economic damages.

### COUNT II

### Violation of 31 U.S.C. § 3729(a)(l)(B) (False Records or Statements)

178.    Relator realleges and incorporates all allegations in this Complaint as though fully set forth herein.

179.    The FCA imposes liability on any person who, among other things, knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(l)(B).

180.    Through the acts described above and otherwise, Defendants, by and through its employees, agents, and representatives, knowingly or acting with deliberate ignorance or reckless disregard for the truth, used or caused to be made or used a false record or statement material to a false or fraudulent claim, namely by making and submitting the above-described Form 2483 and

supporting loan documentation to an SBA-authorized PPP lender and to the SBA, in violation of 31 U.S.C. § 3729(a)(l)(B).

181.    As a result of this conduct, the United States suffered economic damages.

## COUNT III

### Violation of 31 U.S.C. § 3729(a)(l)(G) (Wrongful Retention)

182.    Relator realleges and incorporates all allegations in this Complaint as though fully set forth herein.

183.    The FCA imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(l)(G).

184.    Through the acts described above and otherwise, Defendants, by and through its employees, agents, and representatives, knowingly or acting with deliberate ignorance or reckless disregard for the truth, wrongfully retained overpayments on the PHYSICIANS PPP loan by obtaining SBA forgiveness of the principal amount and accrued interest, in violation of 31 U.S.C. § 3729(a)(l)(G).

185.    As a result of this conduct, the United States suffered economic damages.

## PRAYER FOR RELIEF

WHEREFORE, pursuant to 31 U.S.C. § 3730(b), acting on behalf of, and in the name of, the United States and on his own behalf, Relator demands and prays that judgment be entered in favor of the United States and Relator and against Defendants as follows:

As to Counts I, II and III:

On behalf of the United States, for:

a.    Treble the amount of the Government's damages, plus the maximum statutory penalties for each false claim or false statement;

b.    All costs of this civil action; and

  c.  Prejudgment interest.

And further, on his own behalf, Relator demands and prays that an award be made in his favor for:

  a.  25 percent (25%) of any recovery by the United States if it intervenes in and conducts this action, or 30 percent (30%) of any recovery if the United States does not intervene;

  b.  Reasonable expenses, including all reasonable attorneys' fees, expenses, and costs, incurred by Relator in pursuing these claims; and

  c.  Such other and further relief to which this Court determines Relator is entitled.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Relator demands that this case be tried before a jury.

        Respectfully submitted,

Dated: November 22, 2024     /s/ Michael A. Hirst
             Michael A. Hirst, Esq.
             Marisela Bernal, Esq.
             HIRST LAW GROUP, P.C.
             200 B Street, Suite A
             Davis, CA 95616

             Timothy J. McInnis
             McINNIS LAW
             521 Fifth Avenue 17th Floor
             New York, New York 10175-0038
             [Pro Hac Vice to be applied for]

             *Attorneys for Plaintiff-Relator David Reed*

Michael A. Hirst (CA Bar No. 131034)
michael.hirst@hirstlawgroup.com
Marisela Bernal (CA Bar No. 329589)
marisela.bernal@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, California 95616
P - (530) 756-7700
F - (530) 756-7707

Timothy J. McInnis (NY Bar No. 2205086) (*pending admission pro hac vice*)
tmcinnis@McInnis-Law.com
McINNIS LAW
521 Fifth Avenue 17th Floor
New York, New York 10175-0038
P – (212) 292-4573
F – (718) 732-2304

Counsel for Plaintiff-Relator
David Reed

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* DAVID REED,<br><br>               Plaintiff-Relator,<br><br>     v.<br><br>PHYSICIANS NETWORK MEDICAL<br>GROUP, INC., d/b/a, ADVENTIST HEALTH<br>MEDICAL GROUP and ADVENTIST<br>HEALTH SYSTEM/WEST,<br><br>               Defendants. | Civil Action No:<br><br>**PROOF OF SERVICE**<br><br>**FILED IN CAMERA AND UNDER SEAL<br>PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

## PROOF OF SERVICE

      I live in the County of Yolo, State of California.  I am a citizen of the United States, over

the age of eighteen (18) years, and not a party to the within action. My business address is Hirst

Law Group, P.C., 200 B Street, Suite A, Davis, California, 95616.

      On November 22, 2024, I served the following document(s), described as

      **1.**        **Complaint and Demand for Jury Trial**

      **2.**        **Statement of Material Evidence and Information**

Proof of Service

as follows:

> Hon. Merrick B. Garland
> United States Attorney General
> U.S. Department of Justice
> 950 Pennsylvania Ave., NW
> Washington, D.C. 20530-0001
>
> Hon. Phillip A. Talbert
> United States Attorney
> Colleen M. Kennedy, Esq.
> Assistant United States Attorney
> Eastern District of California
> Robert T. Matsui United States Courthouse
> 501 I Street, Suite 10-100
> Sacramento, CA 95814

I placed a true and correct copy of the foregoing document(s) in a sealed envelope addressed to each interested party as set forth above. I placed each such envelope, with postage thereon fully prepaid, certified mail, and return receipt requested, for collection and mailing in one of the United States Post Offices located in Davis, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this 22nd day of November, 2024, in Davis, California.

/s/Marisela Bernal
Marisela Bernal

Proof of Service